That's our last case of the day. It's case number 4-12-0773, People's State of Illinois v. Jason Doggett. Let's see, we have Attorney Weston on behalf of the appellant and Attorney Johnson on behalf of the appellee. Ms. Weston, are you ready to proceed? Yes. May it please the Court. My name is Kelly Weston, and on behalf of the Office of the State Appeal Offender, I represent the appellant, Jason Doggett. Your Honors, in this case, something happened to Earl Nerman's money. What we don't know is what. The State's theory was that Mr. Doggett forged the signature of Mr. Nerman, and it introduced this pile of checks in support of that theory. However, what the State failed to show was provide the proper foundation in regards to these checks as they sought to admit them as business records of the bank, and they also failed to lay the proper foundation for the computer-stored data. There were many irrelevant checks included in the exhibit. The defense counsel only stopped there on the computer-stored data. Was that argument made at the trial judge? The defense counsel objected as to foundation that they did not discuss the specifics of computer-stored data. So it sort of forfeited then? Because if it had, maybe the trial judge would have given the State the opportunity to raise the proper foundation, to submit the proper foundation. Our position would be that it's not forfeited because the purposes of these rules are to ensure the accuracy and the trustworthiness of this information. If they failed to provide a sufficient foundation, then that can't be ensured and the evidence that was relied upon wouldn't be reliable. And lastly, the State failed to prove Mr. Doggett guilty beyond a reasonable doubt in that they failed to show any real deception on his part. The State's evidence in this case was just not particularly strong. With respect to the first issue, the State allowed these copies of canceled checks to be admitted in the exhibit, which were checks written on Earl Nerman's account. And the State sought to admit them as business records of Earl Nerman's bank. This was an error because the bank, Ms. Howard who testified on behalf of the bank, failed to set a sufficient foundation for the admission of these checks. The business records rule requires that the record be made as a record of any transaction, occurrence, or event made in the regular course of business, and that it's the regular course of business to make it at or near the time of that transaction. Here Ms. Howard specifically stated first that the checks aren't records or entries of the bank, so she really had, she basically was saying they're not records of the bank unless it's presented at the counter, which she could not specifically say as to any of the checks at trial. Where would it be presented? A store or a lot of checks were written to utility companies or things like that. So it may have been presented to another bank or a store, and then it's sent through, Ms. Howard said it's sent through the Federal Reserve, who then sends some file to Mr. Nerman's bank. And then they use the, whatever's in that file, to make a notation on the customer's account to prepare a statement. But they also use those records to disperse the cash to somebody. They rely upon those records to decide whether it was okay for the Federal Clearing House or however this all operates, to give money to that utility company. Because the money's coming from them if it's deposited in that bank. Those are the business records they rely upon on a daily basis to do their banking. Absent those records, what do they do with the dollars in their accounts? Well, they are business records in general, but for the purposes of the hearsay section, they could not, the checks couldn't be business records of the bank. Because they weren't making them, and Ms. Howard's testimony just didn't set a foundation for their admission. So are you saying somebody from the Federal Reserve had to come in and testify? No, because I don't think that it would be their records either. Who would it be? It would be whoever made, certainly it would be whoever made the checks. And that would be your client's accused of doing? He is accused of that, yes. So they can't call him to testify? No, but at least with respect to the checks that were written to Premier Auto, there the woman who testified had a lot more information to set a more reliable foundation for these checks. She noted in an account when another person pays a person's account, sort of like she gave the example of a parent paying for a child's car, well then they make a special memorandum saying this was paid, this check was paid by this person on another, this person's account. So there at least information can be reliable as to what's contained in these checks. And what was that information? The what was? Premier. Oh, that certain checks purportedly written by Mr. Nerman were paid on Mr. Doggett's account. What about the utilities? Did Mr. Nerman have utilities to be paying? He did not have utilities to be paying, but they also didn't provide any account numbers connected to these utility accounts to say that it was Mr. Doggett's either. There are also specific requirements for the computer stored information, which require that the equipment be standard, that the input be made in the regular course of business, and that the sources of information, the method and time of preparation, indicate the trustworthiness of that information. The purposes of this rule, once again, is to provide for the trustworthiness of the information. Here, First National's testimony provided nothing about the type of computer used or the programs. She basically just stated a general description of how to check this cash. So she said if it's written up to a grocery store, that store sends payment through the Federal Reserve, and the Federal Reserve then sends the file to the bank of Earl Nerman, and then they use that information to make the notation on the account. So she also made a statement that the copies were made later or after, but then she was cut off by the state's attorney. So we at least know they make notations on the account to prepare the statements at a time after, reasonably within the time of when the check is cashed. But as far as copies and everything is concerned, it can't be sure. In People v. Bovio, the court there heard really similar testimony to what Ms. Howard said here in terms of the computer equipment, and there they found it wasn't sufficient enough to ensure the trustworthiness of the information. Because the copies of these checks were improperly admitted, the reliability isn't there to allow them in as evidence. And this is the state's main case, the checks. So there's a real threat that the jury decided this case on inadmissible evidence. Turning to the second issue, there were 164 irrelevant checks admitted at trial. The state provided no connection to Mr. Doggett with respect to these 164 checks. So none of those 164 had his signature on them? No. These include the checks that are written to just certain businesses and have no signature of Mr. Doggett, and they're not written to Mr. Doggett. Whose signature do they have? Earl Nerman's. Oh, yes. Well, wouldn't those show Mr. Nerman's handwriting, spending habits, the checks that you might expect regularly to come from his account? They could show a habit. Those checks that were, well, some of the irrelevant ones were checks that the daughter testified were his signature, but many of them included were not. She said they were not his signature, but there was nothing to connect them at all to Mr. Doggett either. Right. Okay. The state also repeatedly, the state included just every check in the exhibit with repeatedly mentioning that over $100,000 was taken. When you subtract the irrelevant checks and also the rent that was owed to Mr. Doggett for this program that Mr. Nerman was a part of, it really turns out to be a little over $54,000. So it's a lot less than the $100,000 amount that the state repeatedly mentioned. Here the state provided absolutely no proof that Mr. Doggett signed these irrelevant checks, obtained control over the money, or that he received a benefit from the checks. They have this burden of proof here. For example, with the utility companies, they could have got account numbers because typically customers have accounts with those places, and they could have, if it was Mr. Doggett who was on the account, then at least there's some relevance there. They failed to do that here. There was also a cumulative effect at play with the exhibit. There was a duplicate copy of almost every check included because they would have a copy of the check and then a couple pages later they would have another copy of that same check included with the back of the check. So it's not clear why exactly they did that, but they also included many checks that were supposedly written by Mr. Nerman, such as to the VA for his health insurance or to his hairdresser even. To include all these irrelevant checks really misrepresents the actual evidence. The jury was given this exhibit at trial and during deliberations. So there's a real threat that they saw this huge stack of checks and made up their minds already and did not disregard any checks that were not proven to be connected to Mr. Doggett. So there's a real threat that they decided this case on an improper basis. In regards to the last issue, the state here failed to prove Mr. Doggett engaged in any deception, which is an essential element of the offense. Once again, the state had the burden of proof and it failed to properly do its job. Mr. Doggett didn't control Mr. Nerman's finances and Mr. Nerman was shown to be of sound mind. He could choose to spend his money how he wished. But the rules of the VA declared that Doggett not take anything from him other than the rent money, is that true? Yes, and there was some evidence of loans in the past between the two of them, but that would just be a violation of policy. It's not against the law. And because there's this evidence of loans in the past, it's possible that he could have been helping Mr. Doggett out as well for some of these checks that may have been relevant. The state's evidence also didn't rule out the possibility that Mr. Nerman authorized these checks to be written. In similar cases concerning theft by deception, where the definition of deception was the same as what was given to the jury in this trial, which was to knowingly create or confirm another's impression which is false and which the defendant does not believe to be true. In those similar cases, there had to have been some representation to the victim that their money was going to be used for the victim's benefit, where then the offender uses it for their own purposes. And here, there just was absolutely no evidence of that. Because the state failed to prove that Mr. Doggett engaged in any deception, which is an essential element of the offense, his conviction should be reversed and his sentence vacanted. Let me ask you a question. Were there ever any questions asked about some of these checks, about who they went to and whether that person or entity had any relationship to Mr. Doggett and Mr. Dognett's personal life or business dealings? The only ones that were connected directly to him were the ones that were to Premier Otto. Okay, so if we discovered that Georgetown Watt was a utility company that provided services to Mr. Doggett's residence, I'm not saying that's true. If we discovered that, would that be relevant? It would be relevant. So I think what you're suggesting is the state may have had it without conceding anything. Maybe the state had a case, they just didn't prove enough. That's correct. They just proved that some of these checks benefited Mr. Doggett, apparently, but many of them weren't specifically tied to him, even though it was suspicious that they were written. Yes. You would concede that many of these are things that Mr. Nerman would not have any use for, personally. Personally, yes. It still doesn't rule out that he was authorizing the checks to be written. Or he wrote them himself to benefit somebody that doesn't have anything to do with the case. And there were many others living in that home as well, and the state's evidence didn't rule those people out either. So that's why they're not relevant to Mr. Doggett. But I take it the names that pop up on here aren't people that were known to the home or Mr. Doggett. The names of… Like a person. That the checks were written to? Yeah. Oh. Well, I know a lot of them weren't written to specific people. They were written to businesses and things. Right. There were some that were included that were gifts to his daughter, like a Christmas check for Christmas, and there were a lot in there that were to his hairdresser. So those were some of the ones that were… What about the Vermilion County Treasurer? Well, about… There wasn't anything really discussed about that. That's just one of the many that weren't included. Okay. Your Honors, if there are no further questions, Mr. Doggett respectfully requests that his conviction be reversed because the state failed to prove him guilty beyond a reasonable doubt, or that the case be remanded for a new trial. How much was the monthly rent that Mr. Norman was supposed to be paying? It varied over time, and it ranged between about $600 to $700, I think, and the total amount that he was rightfully owed was about $32,000 in rent over this time period. It was clear in the exhibit what he was paying for rent in each time period, so that was just a calculation that I did. Thank you. Thank you.  May it please the Court? We do know what happened here. We know that defendant deceived Mr. Norman to the extent of over $100,000. And unfortunately, Mr. Norman died three months prior to this, so he couldn't get on the stand and testify to that, but the direct and circumstantial evidence that was presented proved that beyond a reasonable doubt. Beginning with the issue of the business records, the canceled checks, the optical images of the canceled checks, were business records of the bank. The UCC requires that when an item is paid from an account, and that item, the check, is not returned to the customer, they must maintain, and it can be an optical image, but they must maintain a record of that for a period of seven years. The Uniform Preservation of Private Business Records Act provides that, again, the optical image is the reproduction of the original, and that that optical image can be admissible in court as evidence of the content of the original. Holly Howard, who was the Assistant Vice President of First National Bank, testified here that the bank does not return the actual checks to the customer. Mr. Norman did not get them. Therefore, the bank was required to maintain these optical images of the check. The bank was required to be able to make legible copies of these checks, and the bank was required to preserve them for seven years. Why does the UCC require that the banks preserve them if they're not business records of the bank? Aren't there some of these couple cases, though, that suggest that for the foundation, the banking representative has to say a little bit more about this than, this is our system, we think it's a good one, and then we use an optical scan and we save the checks? Yes, there are, and the cases are distinguishable. BOVIO, which is one that has been brought up in both the brief and in the reply brief by Defense Counsel, is distinguishable because in that instance, it clearly provides that the defendant objected at trial. The specific issue of the foundation of these, as computer-stored records, was objected to at trial. And as I set forth in my brief, it was not here. You can search the record and try to prove me wrong, but I'm confident in saying the word computer-generated or computer-stored or computer-printed record is nowhere in any of the proceedings below. So a foundation objection in general is too general to suggest what's wrong with it? Yes, Your Honor. So the judge said, no, go on. And the reason, and again, of course I've said over and over, foundational issues are easily corrected when objected to. It wasn't here. And courts have also said they're not subject to plain error review because they don't go to the admission of it. They go to the sufficiency of it, which gets back to the weight of it. The weight of the value of the cancel check also goes toward the argument that's been repeatedly made that the bank did not see any of the people write the checks that came out of Mr. Nerman's account. We don't know who wrote them, who signed them. Well, statutory law says we don't have to. The making of the document has no relevancy in its admission. It only goes toward its weight. And that would be, both again, statutorily and under UCC, the lack of personal knowledge regarding all other circumstances of the making of the writing or the record go toward the weight, but not its admission. Holly? Tell me again why plain error analysis wouldn't apply. Plain error analysis would be for if it is attacking the integrity of the decision, of the ruling, or if it is a closely balanced case. We would say this is not closely balanced, and I've discussed that in my brief and I'll discuss it further here. But it also doesn't go to the integrity of it because when you have something that goes to admission of evidence, which is what foundation does, laying the proper foundation for the admission, and not to the weight of it, then there is no substantial deprivation of rights when it is not objected to and it is admitted, even if this court should later find that that admission was not correct. And the defense counsel at the trial argued extensively about these checks and to all of the things that we're discussing again here, that they were not seen who made them, who signed them. The weight of those was addressed significantly with the jury. The jury considered and evaluated the weight. They found them relevant. And the trial court did not abuse its discretion in admitting them. Well, given the number of checks, are they relevant to show buying habits and signature, but prejudicial to the extreme if the names on those checks or the person to whom they're written may have nothing to do with the deceased, but they also have nothing to do with Mr. Doggett? At least it's not shown that they have anything to do with Mr. Doggett. Respectfully, I would say that it was shown both directly and circumstantially. The checks, I have, the way I looked at them, I broke them down into three different categories. The first category were the set of checks that were written by Mr. Nerman prior to the improprieties, and they averaged about three a month, and they showed checks to his health care or the rent. And he was meticulous in noting on the memo line exactly the reason for the payment. Again, averaged about three a month. And again, case law says that those are admissible, especially when the victim has died, as he did here, to show his custom and his habit. Then the second group of checks, and I want to make a note that during that period of time, his meticulous financial management saw his savings grow 40%. In February of 2005, he had $66,500. In August of 2007, he had $93,000. He was very conservative with his finances. And it's notable, when you look at his custom and at his habits, that during this time prior to the improprieties, he never wrote a check to a car dealership, a home repair store, a utility company, a phone company, a cellular company, a furniture store, a carpet store, broadband provider, automotive shop, veterinarian, paint store, or a landscaper. Never. Those checks were relevant. Then you get to the next group of checks. And these checks bring into play the handwriting. And Illinois rules of evidence say that Mr. Nerman's daughter could, based on familiarity, testify to the authenticity of these signatures. And she testified and was honest on which checks she believed had her father's signature and which ones did not. Taking the ones that did not, we had some that were directly linked to the defendant and some that were circumstantially. What is a circumstantial link to a check? Give me an example. A circumstantial link to a check would be the evidence that during the time Mr. Nerman lived in the house, there was testimony that the defendant's house was improved and renovated and remodeled. Not Mr. Nerman's room that he actually paid to rent, but the defendant's house in general. And then you take that and you compare it to checks. For example, to Menards. Menards is a home improvement store. On the front of the Menards check is the name Jason Doggett and the driver's license number for Jason Doggett. That driver's license number can be found over here on a check to the landscaping company. That circumstantially connects the defendant to these checks. Then you have checks where Premier Otto came in and acknowledged this check was written to Mr. Doggett's account. It was presented by Mr. Doggett. But it was signed by Mr. Nerman. No, that wasn't the testimony.  Yeah, it was, but it had his name on it. So it's reasonable to infer you've got evidence, unrebutted, that he paid for two to three cars with a check written on Mr. Nerman's account, and he presented it. And you have a signature that the daughter has been said, that's not my dad's. You can take that. You can compare it to Menards. You can compare it to all of these others that are linked back to him. The jury had the right to compare those and make reasonable inferences from them. And if they feel they match up, it's reasonable to infer he wrote those checks. They were circumstantially linked. Is the amount of the checks or the amount that may have been taken by deception, does that meet some statutory limit? It exceeds the $100,000 that we were required to prove. You were required to prove that. Yes. Even after you take out the rents that he was rightfully owed. Addressing a little bit the third issue here, and I will say directly, I would say that Premier Auto and the Menards checks and the checks that had notations specific to Mr. Doggett or his driver's license, those were the ones that I refer to as directly linked to. What about Georgetown Water, for example? Well, we had testimony that Mr. Nerman did not own any other properties. He didn't have anything where he would be paying those types of services. So we have that combined with Mr. Hill's testimony that those services are specifically included in the cost of care. And although it's been referred to as a rent payment, it was an all-inclusive payment for all costs of care, which would include utilities. Did Georgetown Water Service provide water service to the home? There was not testimony to that, no. It was a circumstantial connection. But that would be a circumstantial connection where there's absolutely no direct proof that that benefited Mr. Doggett. It's circumstantial. Circumstantial. But there are some checks on there like that where the only link is he wrote this check. It benefited him. He probably wrote these. That's the inference. That would be the circumstantial link. And it would be a reasonable inference based on, again, the testimony. What was Young's? Young's Appliance, I believe. It was an appliance. And there was testimony about kitchen remodels. Same thing with the carpeting, windows, landscaping. And again, one of the landscaping checks had his driver's license information on it. Addressing the third argument, that we didn't prove him guilty beyond a reasonable doubt. Respectfully, I just disagree. And I will resist this urge to restate all the inconsistencies that I put in my brief that the jury was responsible for resolving. And I will focus on this issue of whether we established that defendant created a false impression. That he knew to be false. And I'm going to briefly recite the evidence that I think specifically did that. And then I'll explain at the back side why. He'll testify the relationship was contractual and that a violation of the agreement would result in defendant being removed from the VA's residential care program. Part of the agreement, again, was that you would only accept a rent payment which was all inclusive and that there couldn't be any borrowing or exchanges of monies or demands for money in any other way. In October of 2009, Hill received a complaint from CRIS Senior Services. And they had suspicions about five checks that had been written from Mr. Nerman's account. One of those checks was a $1,000 check written to defendant. The very following day, Mr. Hill went to Mr. Nerman at the defendant's home and asked about these checks and about the $1,000 check. And Mr. Nerman said, I didn't write it. He then asked Mr. Nerman if he would be willing to get copies of his bank statements. And he said that he would. During a visit, the next visit he came back, Mr. Nerman did not have any bank statements. Defendant had said he would take them to the bank to get them. He had not done so. Second month, December of 2009, comes back. Still no bank statements. As a conversation, defendant at that time admits that there had been $3,200 advanced to him and that he had paid back about $1,500 and that the rest would be paid back and that there were no other outstanding checks or advances, however he wanted to phrase it. So we have this admission. Then we have three more months of Mr. Hill visiting and still no bank statements. And during this time, inquiring why no bank statements, Mr. Hill is told by defendant, an admission I would argue, that Mr. Nerman doesn't want to produce these for you because he doesn't want me to get in trouble. After six months, Mr. Hill presents Mr. Nerman with a written release which the bank has instructed what they need on that release in order to provide them copies. Mr. Nerman willingly signs it. We go to the bank, find out that there have been improprieties. He takes this to Mr. Nerman who then goes and closes the account. Now, all of that in a rather terse way, and I apologize, is evidence that defendant created an impression that he knew was false. For example, when Mr. Nerman finally finds out he sees these bank statements and he sees for the first time all these checks that have been written, what's the first thing he does? He goes to the bank and closes the account. Who does he take? Does he take the defendant who for six months has promised to drive him there? The defendant who argued to the jury before the trial that Mr. Nerman purposefully wrote these checks to share his wealth? No. He goes with Mr. Hill, closes the account, cuts off the access that the defendant had, and he opens a new account. We know from his own admission that there had been this conversation and that accepting what defendant said is true, that Mr. Nerman didn't want to produce the records because he didn't want defendant to get in trouble. If we accept that as true, it means that there was a conversation. And we don't know the substance of the conversation, but we know that after that conversation between defendant and Mr. Nerman, Mr. Nerman still didn't, you know, apparently push too hard for the bank records, accepted that everything was okay, believed whatever the defendant told him, believed that conversation. And yet we know things weren't okay. We know it wasn't just $3,200. We know from a year prior to that statement that he had been repeated checks written to defendant had been drawn from Mr. Nerman's account. And it wasn't $3,200. And, in fact, in one month alone, it was over $3,800. In one month, there were seven checks alone written to defendant. Whatever that conversation was, what Mr. Nerman came away with was, it must be okay because there's no evidence that he got more actively agitated in trying to get these bank statements and to prove otherwise. We know that the statement he gave to Mr. Hill was similarly false. It wasn't $3,200. The jury had evidence of all of this. The jury also had evidence that the minute Mr. Hill confronted defendant about this, miraculously, checks stopped being written from those accounts. In the six months following the confrontation with the defendant, those same six months the defendant is saying he'll take Mr. Nerman to the bank and get copies, in those six months, a total of eight checks were written. Two in November, one in December, one in January, three in February, and one in March. The jury had evidence of all this. At the point of confrontation, all of this changes. Now, by the end of March, the jury also had evidence that there was $2,489 remaining in an account that two years prior had over $93,000. They had evidence that during those six months, Mr. Nerman's account was regularly overdrawn from checks that his daughter said were not signed by him. All of that shattered Mr. Nerman's false impression. He knew the truth, and he had Mr. Hill take him to the bank, and they closed the account. From thereafter, Mr. Nerman spent his days making sure he was in attendance at all pretrial proceedings until he died three months before trial. I think the state proved, beyond a reasonable doubt, the defendant created a false impression, and he knew it to be false. I also want to recognize that in response to a question that you asked, Justice Connett, the bank did rely on those records on a day-to-day basis. And if you take those out, there are no bank records. They relied on them to make the bank statements. And as I pointed out in my brief, the defendant takes no issue with foundational sufficiency of admission for those bank statements,  for the bank statements are the optical images of the canceled checks. I would also say that Holly Howard did not testify that they would not bank records unless they were presented at the bank. What she testified to was that if she could see in more detail or a better opportunity the back of the check, she would, one, be able to tell if it was presented at the bank, and two, that if they were presented at the bank, they became entries of the bank. She did not say they were not the records of the bank, absence of their actually being presented there. Although it was said that any improprieties may have been a violation of the policy between the VA and the defendant, it was much more than that. This was defendant's livelihood, and he knew that he could be kicked out of this program if it was determined that he was abusing and violating those policies. We connected them, the checks were relevant, they were business records. We proved he created an impression that was false beyond a reasonable doubt, and we would respectfully ask for support to affirm the trial. Thank you, Ms. Johnson. Ms. Weston, any rebuttal? Thank you. In regards to what the state just mentioned about not complaining of the bank's statements, there's a few reasons that those were admissible, I guess. They still didn't provide the computer-stored foundation, but at least those statements are something that the bank is creating themselves. They have a real interest in keeping those statements reliable because it's what they send to the customers, and it's how they keep track of the customers' accounts. Also, the statements weren't objected to at trial or included in any post-trial motions. And they, frankly, don't implicate Mr. Doggett in any way. It just shows what's coming in and going out of the account each month. It doesn't have any relation to Mr. Doggett. In terms of deception and the statements that Mr. Nerman made of not wanting to get Mr. Doggett in trouble, this could have been because of the rules that they cannot loan money to sponsors in the program. There was nothing to show that there was any actual deception. In similar cases, there had to have been some specific representation or statement to the victim that their money was being used for their benefit. Here, there just wasn't anything about that. Also, it may have taken him, so it took six months to get these statements. If Mr. Nerman was really concerned, then I think he would have found a way to get to the bank within six months. Maybe, once again, he could have been authorizing these checks or loaning the money to Mr. Doggett, and he just didn't want to get him in trouble with the program. I believe it was Mr. Doggett that said, Mr. Nerman doesn't want access to the checks because it might get me in trouble. Mr. Nerman didn't say that. I mean, we don't know that Mr. Nerman said anything like that. Am I misunderstanding? At least from what I thought in the record, I thought that Mr. Hill said Mr. Nerman stated he didn't want to get him in trouble, but maybe I'm wrong. That should not have been admissible, right? Yes, it's hearsay. The state mentioned Earl's spending habits as well, which could have plausibly changed over time. It still doesn't show any deception. With respect to all these checks, that they're comparing signatures and things, there was nothing to show that even the checks that may be relevant were, there was no expert testimony provided or anything, that this was Mr. Doggett's handwriting. So maybe the most they can do is, the jury can do is look and think they might be similar, but if we are going to get into that, then the signatures throughout that exhibit are different and change from month to month. Once again, there were many people in that home. There was nothing to connect directly to Mr. Doggett for many of these checks. With respect to the UCC and the Uniform Preservation of Private Business Records Act, those statutes govern financial institutions and banking practices. For the business records exception to the hearsay rule, there are specific requirements, and they were not met by Ms. Howard's testimony in this case. In terms of forfeiture as well, there was a general objection to Foundation. He didn't specifically mention the computer stored rules. In one of the cases cited to in our brief of People v. Johnson, it included AOL transcripts in a sexual assault case. There was no objection at trial, but the appellate court reviewed for plain error because of the prejudicial effect of what was contained in the transcripts. I would also argue that it should be reviewed for plain error because the evidence was closely balanced on deception, in that there was no specific act or showing of deception on Mr. Doggett's part, and also that the integrity of the judicial process was affected because these checks were the state's main case and it's presumably what the jury relied upon in admissible evidence in making their decision. Thank you. Thank you, Counsel. We'll take this matter under advisement and be in recess.